[No. D056010. Fourth Dist., Div. One. Jan. 11, 2011.]

In re the Marriage of MARIA FERNANDEZ-ABIN and HIGINIO SANCHEZ.
MARIA DEL CARMEN FERNANDEZ-ABIN, Respondent, v.
HIGINIO SANCHEZ, Appellant.

COUNSEL

Victor Augustus Mordey for Appellant.

Law Offices of Martin N. Buchanan and Martin Nebrida Buchanan for Respondent.

OPINION

**BENKE, Acting P. J.**—Higinio Sanchez (husband) appeals the restraining order issued under the Domestic Violence Protection Act (DVPA) (Fam. Code,[1] § 6200 et seq.) protecting Maria Del Carmen Fernandez-Abin (wife) and their minor son and daughter. Husband claims the California court erred when it included the children within the scope of the restraining order and made various rulings regarding visitation and custody because, in an earlier proceeding before a different judge, that court had granted his motion brought under the Uniform Child Custody Jurisdiction and Enforcement Act (§ 3400 et seq. (UCCJEA)) to dismiss the children. In so doing, that court found it lacked emergency jurisdiction over the children because wife already had initiated divorce and custody proceedings in family court in Tijuana, Mexico, and thus the court in Mexico had exclusive and continuing jurisdiction over them.

According to husband, because wife did not appeal the earlier order from the California court, and because the issue of jurisdiction was adjudicated on the merits and allegedly was a final appealable order, that court was barred on a number of grounds from subsequently revisiting the jurisdiction issue in the evidentiary hearing in connection with wife's request for a domestic violence restraining order against husband.

Finally, husband claims the restraining order had the effect of denying him "all contact with his children" in violation of his fundamental rights under the Fourteenth Amendment and, claims the California court's finding regarding the "habitual residence" of the children is not supported by substantial evidence in the record.

For reasons we explain, we conclude the California court erred when, at the subsequent evidentiary hearing on wife's request for a permanent restraining order, it included the children within the scope of that order and made various rulings regarding custody and visitation ostensibly without regard to the jurisdiction of the Tijuana family court and the UCCJEA. As we discuss,

---

[1] All further statutory references are to the Family Code unless otherwise specified.

the UCCJEA is the *exclusive* means to determine jurisdiction over a child in connection with any "child custody proceeding," which includes custody and/or visitation orders made in a domestic violence proceeding (§ 3402, subds. (c), (d)) and applies to child custody determinations made in a foreign country (§ 3405), even if the competing forum has not adopted the UCCJEA.

However, we also conclude the California court was not precluded from revisiting the issue of whether to exercise temporary emergency jurisdiction over the children under section 3424, subdivision (a), after it made findings in the evidentiary hearing that husband committed acts of domestic violence against wife witnessed by the children and that husband took the children without a court order and kept wife from seeing them for over three months.[2] Because the record shows the California court neither based its decision on section 3424 nor followed the requirements of that statute when it included the children within the permanent restraining order, and because the record also shows the California court effectively disregarded the jurisdiction of the Tijuana family court in making custody and visitation determinations in connection with that order, we conclude the prudent course is to reverse the permanent restraining order as it pertains to the children, and custody and visitation, and to remand the matter with instructions.

On remand, the California court is directed to follow the UCCJEA, including, but not limited to, section 3424, subdivision (a), in determining whether jurisdiction existed over the children when it included them within the protection of wife's restraining order and made custody and visitation determinations. The California court is further directed to make appropriate findings based on this statutory scheme and *if* jurisdiction exists, to adhere to the statutory requirements of the UCCJEA, including, but not limited to, those set forth in subdivisions (c) and (d) of section 3424.

## FACTUAL AND PROCEDURAL BACKGROUND

Husband and wife were married in Mexico in 1995. They have two children, both born in San Diego. Their daughter was born in 1998 and their son in 2003.

### A. *Wife Files a Petition for Separation and Divorce in Tijuana, Mexico*

In early October 2007, wife filed a petition for legal separation in the family court in Tijuana. Later that month, husband requested visitation with

---

[2] By suggesting the California court *may* have been able to exercise temporary emergency jurisdiction over the children pursuant to section 3424, we are not making any such finding or implying the California court on remand should or must exercise such jurisdiction.

the children, case No. 1676/2007, later renumbered case No. 702/2008 (custody proceeding). In late October 2007, husband and wife reached an agreement regarding husband's visitation rights, which wife claims never became an order of the Mexican court.

In early December 2007, wife filed for divorce in Tijuana, case No. 1995/2007 (divorce proceeding). The court in Tijuana "opened the case" in January 2008, granted wife legal and physical custody of the children and ordered husband to pay child support. The court in Tijuana also ordered husband not to leave the country without the court's permission, unless husband had an attorney available in Mexico.

In April 2008, wife filed a challenge to the judge in the custody proceeding. However, before her motion was heard, that judge withdrew from the case. In late April 2008, the custody proceeding was reassigned to Judge Josefina Magana.

In mid-June 2008, husband, accompanied by about 10 armed men carrying assault weapons, went to wife's parents' house in Tijuana, took the children and never returned them home.[3] The following day, wife went to the district attorney in Tijuana and reported the abduction of the children. Wife also filed a request in the custody proceeding for the return of her children. In early July 2008, Judge Magana ordered the Tijuana district attorney to investigate the abduction of the children and terminated the parties' visitation agreement.

Although husband admitted he took the children and had them in his custody, he alleged he did so because wife committed incest and abused the children. Husband thus sought his own order for custody of the children.

On July 9, 2008, Judge Magana confirmed husband did not have primary custody over the children and ordered husband not to have any visitation with them or to remove them from Tijuana. That same day, the Tijuana district attorney notified Judge Magana that an investigation had been initiated regarding the children and their abduction.

In mid-July 2008, wife completed a Hague Convention petition, which was sent to the United States Central Authority, forwarded to the California Attorney General's Office and finally sent to the San Diego County District Attorney's Office. In August 2008, wife moved to San Diego after she obtained legal residency.

---

[3] Husband proffered evidence to show the armed men were actually part of the Baja California government security program (the Integral Protection to Executives Program (PIPE) of the Baja California State Preventive Police), whose purpose was to provide "personal security to businessmen, and their relatives, residing in the state of Baja California."

In August 2008, Judge Magana denied husband any visitation with the children unless and until he returned them to wife. Husband refused.

In early September 2008, the family court in the Mexico divorce proceeding ordered the court clerk and law enforcement to use any force necessary to recover the children from husband's Tijuana residence and return them to wife. The court also ordered husband to "refrain from bothering or causing any damage to [wife], in the understanding that if he does not obey such order, he shall be punishable with a fine equivalent to THIRTY TIMES the minimum daily wage for this region, which can be duplicated if violation is repeated." That same day, Judge Magana in the separate custody proceeding ordered the children enrolled in school, as the school semester in Tijuana had commenced in late August 2008.

On two occasions in early September 2008 the court clerk and law enforcement in Mexico went to husband's home in Tijuana to enforce the family court's order to recover the children and return them to wife. On both occasions, neither the husband nor the children were present. Rather than return the children as ordered, husband filed in federal court in Tijuana a request to suspend that order. That request was denied.

### B. Wife Files a Request for Restraining Order in San Diego Superior Court

The hearing on wife's Hague Convention petition took place in San Diego in late September 2008 (*San Diego District Attorney v. Sanchez Campoy* (Super. Ct. San Diego County, No. D511991)). Based on that hearing, the Child Abduction unit of the San Diego County District Attorney's Office sent a team of officers to remove the children from husband's home in Chula Vista, California, where they were living. Later that day after the children and wife were reunited, wife claimed that husband told her during a telephone conversation that he would have her killed if she returned to Tijuana.[4] Wife took the children to Mexico, and then crossed the border back into the United States. Wife and the children went to a domestic violence shelter in an undisclosed location in San Diego, afraid that if husband knew their whereabouts he would attempt to abduct the children.

On November 7, 2008, wife filed in Superior Court of California, County of San Diego (case No. DV028320) (DVPA action), a request for restraining order to protect herself and the two children. Wife declared under penalty of perjury in support of her request that husband was armed and dangerous, she

---

[4] Husband denied threatening to kill wife and proffered evidence, including from his brother-in-law who was present when this phone call took place, to show he never made such threats.

was afraid to return to Mexico because of his threats to kill her, and husband was a "very powerful man in Tijuana" and was able to pay and get most anything he wanted.

Wife further alleged, in support of her request, that husband was abusive for the majority of their relationship, his violent behavior toward her had escalated, and she had become very frightened of him. In addition to his threat to kill her, wife recounted another incident of domestic violence that took place in late September 2007, which she said was the deciding factor for her to leave husband: "At approx[imately] 8:00 pm Respondent [husband] called me into our bedroom. Our children were also present. He was angry that our children didn't want to attend the children's birthday party being thrown by his sister. He was infuriated and yelled accusations at me about turning our children against his family. I told him that it wasn't true and tried to diffuse the situation. The fact is that he often says terrible things about my family members in front [of] the children, not the other way around. The tension was high. A short while later, while I was preparing his dinner, he got angry and started calling me every foul name imaginable. He claimed that I had made a face at him. The children were present and I didn't want them exposed to this type of language, so I left the kitchen and went towards the stairs. He continued to yell at me and also accused me of having an affair. He started rubbing his hands over my body in an unwelcome and disgusting manner. I ran up the stairs. Respondent ran after me and caught me in the hall. He continued to accuse me of infidelity and even accused me of having sex with my father. I could see that he was out of control. I was terrified. I tried to diffuse the situation because the children weren't too far from us. I wanted them to bed before anything else erupted. Later, after they were in bed, I thought Respondent had also calmed down. As I was walking, Respondent came towards me and forcefully shoved me down the hall. He hit me with such force, I flew about six feet and landed on my knee. I felt excruciating pain because I had just completed seven months of physical therapy due to a serious auto accident. The children came out of their rooms to see me lying down in pain. I got up quickly to avoid having him kick me as he has in the past. I could see the anger in Respondent's face. I moved towards the door as fast as I could. The children followed, terrified by the incident and crying. I got into my car. Respondent struck the car with his fists. I yelled for the children to get in. As my daughter was trying to enter the car, Respondent grabbed them both and prevented them from getting in. I told them I would be back for them. I went directly to the Police Station and reported the incident . . . . These two attacks follow years of such episodes. He has sexually assaulted and attacked me too many times to count. In June of 2007, Respondent put his hands around my neck three times and strangled me while we were getting ready to go out. I have been living in fear for a very long time. The violence got progressively worse over the years. Many of the

incidences happened in the presence of our children. Respondent has a friend who is an MD. He prescribes him narcotics or any drugs that he desires. Respondent often mixes the drugs with alcohol and the result is disasterous [*sic*]. He is even more violent and irrational. Now that I have left him, and have full custody of our children, he is angrier than ever. He has done things to my family member[s] that I never could have imagined . . . . He had my brother's house bombed and framed my father, which resulted in his arrest and damage to his good reputation. It is common knowledge in Tijuana that he wants me dead. I don't want our children to be caught in the crossfire."[5]

The California court, Judge Lorna Alksne presiding, granted wife an ex parte temporary restraining order and set the matter for hearing on December 1, 2008. The ex parte temporary restraining order included personal conduct and stay-away orders protecting wife and the children. The California court also temporarily granted legal and physical custody of the children to wife, with no visitation for husband.[6]

### C. Husband Files a Request for Visitation in the Mexican Family Court

In early October 2008, while wife was living in the United States with the children, husband filed a request for visitation in the custody proceeding in Mexico. Judge Magana on October 17, 2008, ordered husband, wife and the children to undergo a psychological evaluation as a condition to visitation and ordered the children to appear before her on November 19, 2008. Wife claimed she was not informed of that order until November 8, 2008, a day *after* she had filed the restraining order in San Diego family court.[7]

Three hearings took place in Tijuana on November 19, 2008. In the first hearing, the court in the divorce proceeding ordered wife's clothing and other items returned to her. To carry out that order, an official of the Mexican court and wife's attorney in Mexico went to husband's Tijuana home and retrieved wife's belongings. In a second hearing in the custody proceeding, the court confirmed its decision for the psychological evaluation. Husband and his attorney were at the hearing, but neither the children nor the wife attended. Finally, there was a third hearing that day in a Mexican federal court regarding husband's request to stay the child support order.

---

[5] Husband also denied these allegations.

[6] The "Mom" box in the child custody and visitation order appears to have been mistakenly checked instead of the "Dad" box in connection with the "no visitation" order, inasmuch as the court gave wife provisional legal and physical custody of the children.

[7] The record shows that in its September 30, 2009 order, the California court found that wife in late October 2008 was "duly served" with Judge Magana's order requiring wife and the children to appear before her on November 19, 2008, which was prior to wife filing her request for restraining order in the DVPA action.

On November 25, 2008, Judge Magana issued an order allowing husband 10 hours each week of visitation with the children, under wife's supervision, and 60 minutes of telephone contact each day by mobile phone (or other means) provided by husband.[8] Judge Magana's order was based in part on wife's lack of compliance with that court's October 17, 2008 order, which required wife and the children to attend the November 19, 2008 hearing in Mexico. Although wife was granted guardianship and custody of the children, Judge Magana noted husband was entitled to spend time with his children, particularly because he had not yet lost "[l]egal [c]ustody" of them. Judge Magana also ruled wife was to inform the court within three days of the November 25 order where she and the children were living, and cautioned wife that if she did not comply, she could face sanctions equal to "twenty times the minimum wage in the economic area."

### D. *Jurisdiction and Forum Non Conveniens*

On November 26, 2008, husband in the DVPA action filed a motion to quash and dismiss the domestic violence proceedings for lack of jurisdiction and on the grounds of forum non conveniens. In his motion, husband claimed the California court lacked jurisdiction because both husband and wife were citizens of Mexico and domiciled in Tijuana, and because both the children, although citizens both of Mexico and the United States, also were domiciled in Tijuana.

Husband further claimed the California court lacked jurisdiction because a divorce proceeding initiated by wife was pending in the Tijuana family court, which already had made orders regarding custody, parenting and related issues. As such, husband claimed the Tijuana family court was the appropriate forum to resolve all such issues and accused wife of "forum shopping" to avoid the Tijuana family court's November 25, 2008 visitation order.

Finally, husband claimed the California court lacked jurisdiction because the "two children have been wrongfully taken and concealed, and [husband's] parental rights . . . have been violated, in contravention of the orders of the Tijuana Family Court entered on various dates . . . ." According to husband, because there was no emergency or other legally cognizable basis for the California court to assume jurisdiction, and because the proceedings in the Tijuana family court were not concluded and that court had not renounced jurisdiction, the California court in the DVPA action lacked jurisdiction over their "dissolution and other related matters."

At the December 1, 2008 hearing on husband's motion, the California court, Judge Joel Wohlfeil presiding, addressed whether California had

---

[8] As translated into English, the order by Judge Magana was made on November 25, 2008, but file-stamped November 27, 2008.

"jurisdiction to issue custody orders" in light of the fact the family court in Mexico already had made various orders in connection with the children and husband's visitation. After a lengthy oral argument, the California court continued the matter to December 10, 2008.

In so doing, that court found it had temporary emergency jurisdiction over the children pursuant to section 3424, subdivision (a), admonished husband that at least until the December 10 hearing he was to comply with the order permitting wife to be the primary custodial parent of the children, and cautioned wife to respect husband's visitation rights as reflected under the most recent order by the family court in Mexico. The California court further directed both parties to appear in a court in Mexico as soon as reasonably possible, but before the December 10 hearing, to "clarify any ambiguities" that may exist as a result of the most recent custody and visitation order issued by the court in Mexico.

Finally, the California court said it was "extremely uncomfortable" exercising jurisdiction over the children after December 10 but that if it was to err, it was going to do so on the side of protecting the children in light of the allegation that husband and armed bodyguards had taken the children from wife's parents' house in Mexico.[9]

At the December 10 hearing, the California court noted the only issue before it was whether the court intended to take "emergency jurisdiction" of the children to make custody determinations. Wife indicated her legal counsel in Mexico was timely challenging the November 25, 2008 order by Judge Magana giving husband 10 hours of visitation with the children. In response to the court's question of what relief was available in the DVPA action in California that was not available to wife in the custody proceeding in Mexico, wife's counsel noted the issue was the "integrity of the judicial system" in Mexico, and pointed out that it took a Hague Convention petition and the SWAT (special weapons and tactics) team to recover the children from husband.

The California court reviewed the pertinent "facts" taken from wife's declaration and concluded Judge Magana's orders were "reasonable, fair and balanced," Judge Magana was discharging her obligations properly and nothing done by the Tijuana family court caused the California court in the DVPA action to question Judge Magana's integrity. To avoid making orders that conflicted with those of the family court in Mexico, the California court refused to assume jurisdiction over the children without Judge Magana first relinquishing such jurisdiction.

---

[9] The California court was under the mistaken belief husband and his armed bodyguards took the children in June *2007*, when in fact it was in June *2008*, *after* wife and husband separated, and not long before wife filed the DVPA action.

The California court reissued the temporary restraining order to protect wife and set an evidentiary hearing to consider wife's request for a permanent restraining order. However, as to the children, the California court granted husband's motion to quash and to dismiss "on the basis that this court lacks jurisdiction to issue orders involving the two minor[s]."[10] The California court informed the parties at the conclusion of the hearing their case was being reassigned to Judge Lisa Schall because Judge Wohlfeil was being transferred to another department.

### E. *Letter Rogatory by Judge Magana Regarding Husband's Visitation*

On February 13, 2009, Judge Magana remitted a letter rogatory to the California court in the DVPA action. In the letter rogatory, accompanied by a 63-page insert, Judge Magana requested compliance with her November 25, 2008 visitation order, which, as relevant here, provided: "[I]n virtue of the powers vested in me, the presiding Judge, and based on the diverse motions filed by the parties and their arguments, and upon the imminent fear of the petitioner [wife] to bring the children to this city [i.e., Tijuana] . . . , and it being evident, that in this Trial it has been appreciated that the problems between the parties as well as those of their children have been publicly made known through several mass means of communication, such as, newspapers, Internet, television, billboards, prints, etc[.]; thereby and from the publication of their photographs leaving the children and their parents fully identifiable by society, and vulnerable to any crime against them, and because of what is evident, by the number of crimes committed in this city, the children . . . are in constant risk and under imminent danger; if they were to become subject of such circumstances, the physical integrity, health and emotional stability of the parties' children would be put at risk, by the constant insecurity that prevails over this city; in order to guarantee and take the necessary means of protection of the children, it is evident that if the visitation schedule were to be undertaken by [husband] with his children in this city, they would be put in danger; therefore, it is concluded that such visitation should be held in a safe environment, away from any danger . . . . [This court is informed wife] is residing in the United States of America in the company of her children, [and considering] the school calendar, psychological treatment and extracurricular activities of said children, and in aid of and for the compliance of the obligations of this Court, . . . for [husband], with his children . . . , per the terms of the order issued by this Court on November twenty fifth of two thousand eight, so that the ten hours per week established in the order of reference are distributed by said Court, between Tuesdays, Saturdays and Sundays of each week, or in its case, in the manner it considers appropriate,

---

[10] Because the California court found a conflict in the evidence regarding whether husband was living temporarily or permanently in the United States, the California court specifically noted its ruling was not based on the grounds of forum non conveniens.

and per the circumstances and schedules established at the place designated to hold such visitation, in the best interest of the children, their physical security and emotional stability and taking into consideration the children's schedule presented by [wife]. With regard to the sixty minutes of communication per day by [husband] via telephone, granted by this Court, they can be held every day at eight PM, also respecting the children's activity schedule of reference, or in its case in the manner he/she may deem convenient for the children. Likewise, [the court] request[s] the Superior Court of San Diego . . . interview the children . . . and with the assistance of personnel specialized in psychology or child therapy, on the date and time the Court's business hours allow it, so they may be he[a]rd in Trial, since they are a fundamental part of the parties' dispute, and whom would result most affected by the judicial determinations made, not only by this Court, but also by the Superior Court of San Diego. Furthermore, [the court] request[s the] Superior Court to inform [this court] as soon as possible the outcome of the petition herein made, assuring reciprocity by this Court in similar cases."

Husband in late February 2009 filed in the California court a request for registration of Judge Magana's letter rogatory, pursuant to section 3400 et seq.[11]

### F. *April 2009 Evidentiary Hearing on Permanent Restraining Order*[12]

The parties each filed voluminous materials in the DVPA action in connection with the April 2009 evidentiary hearing on wife's restraining order. At the outset of the hearing, the parties disagreed on the issue or issues pending before the California court.

Wife, on the one hand, argued the children should be included in her application for a permanent restraining order because, since the December 10, 2008 hearing, much more information had come to light regarding the children and their need for protection, including the letter rogatory from Judge Magana "saying [Judge Magana couldn't] protect the children in Mexico."

Husband, on the other hand, argued the only issue pending before the court was whether *wife* was entitled to a permanent restraining order, inasmuch as the California court had already ruled at the December 10, 2008 hearing that

---

[11] Wife requested the California court take judicial notice of husband's request for registration of the letter rogatory by Judge Magana. As discussed *post*, the California court, Judge Schall presiding, later consolidated husband's request with wife's petition for domestic violence restraining order.

[12] This court on February 5, 2010, granted husband's motion to augment the record to include the transcript of the evidentiary hearing that commenced on April 3, 2009.

the court lacked jurisdiction over the children because of the ongoing proceedings in Mexico initiated by wife.

The California court, Judge Schall presiding, disagreed with husband, noting the California court on December 10 merely "denied an ex parte application. We are here to address fully on the merits, so the issue of the children are before me today, so be anticipating that." Judge Schall bifurcated the evidentiary hearing to address the request by wife for a permanent restraining order and if granted, then the issue of custody and visitation, if necessary.

During the evidentiary hearing, husband admitted the two children were living with him in the United States between June 19, 2008, and September 28, 2008. Husband testified that while the children were living with him, wife never once attempted to call him to check on or inquire about their well-being, despite the fact husband had not (at the time of trial) changed his mobile phone number for 16 years.[13] Husband also testified that although the children were enrolled in a school in Tijuana, he paid a person (whose name he could not remember) $200 to home school the children.

Finally, husband admitted that while the children were living with him during this period, he lacked an order from "any court" giving him custody over the children. Husband also admitted his visitation rights were suspended in July 2008, but alleged he did not became aware of that fact until August 2008.

At the conclusion of his testimony, husband sought to introduce an 11-page resolution from a court in Mexico allegedly disposing of wife's appeal to the November 25, 2008 visitation order issued by Judge Magana. Wife objected to the admission of this document on the basis it was in Spanish and not translated into English, and argued her appeal of that order was not yet final. Husband argued the California court was bound by the ruling of the Mexican court.

Judge Schall again disagreed with husband. The California court noted that if it rules "there is a valid basis for the granting of the permanent restraining order under California law, that the paramount interest of the child or children overrules any order from out of state if [it] believe[s] the children are actually at risk."

---

[13] Wife disputed husband's testimony that she never attempted to call or contact the children while they were living with husband in Chula Vista, California. Wife instead claimed she called husband's mobile phone many times, but he never answered, and went several times to husband's house and the children's school in Mexico to look for them. The evidence in the record also shows wife took many other steps to locate the children while they were living in Chula Vista with husband, including contacting the district attorney in Mexico regarding their disappearance.

Wife's legal counsel from Mexico testified in the DVPA action. Counsel stated that four divorce actions had been filed in Tijuana involving the parties, that three were still (then) pending and that the cases were likely to go on for years. Wife's Mexican counsel also testified wife had appealed the visitation order issued by the Mexican family court and the appeal was not final. Wife also testified in November 2008, when she filed her request for restraining order, she and the children were living in a domestic violence shelter, and she had been living exclusively in San Diego since August 2008. Wife said she initially lived in Chula Vista, California, at her brother's relative's house, and then moved to the shelter about a week after she and the children were reunited.

Wife testified about the abuse she suffered by husband on September 26, 2007, which she claimed was the deciding factor to separate from him. On that night, while she was lying on the floor of her house, she testified: "I saw hatred in his [(husband's)] eyes and madness that I had already seen in the past that he was against me. He tried to kick me just like he had done in many occasions, and I knew that I had to leave running, because during the 12 years of marriage, it was already too much what he had done to me. [¶] Every day his physical aggression against me was worse. He had had the nerve to put his hands on my neck and throw me against the wall. He had kicked me; spit on me. A year prior, I had to file a police report. I went to a doctor and he had confirmed that [husband] had hit me on the face. I did not continue with that report I had filed because I knew that the bodyguards were always following me. And I was afraid that something would happen to me. [¶] When this happened on that day, previous days before, he had already said things. In fact, the week before, I had already called the domestic violence unit. I have a document to that effect where I had made that phone call. But I knew that even though the police from the domestic violence unit would arrive, they weren't going to be able to even come inside the house because it was a fortress. [¶] I never would have wanted to leave that house. I had all the luxuries, I had all the money, I had all the comforts, but I could not allow for my children to continue living and seeing that." Wife concluded her testimony that she was afraid husband would "kidnap" the children again.

At the conclusion of the hearing, the court granted wife's request for a permanent restraining order for a two-year period, and named wife *and* the children as parties protected by that order. Specifically, the court found: "[T]here are two minor children of this marriage . . . . [¶] . . . [¶] It's duly noted these children have remained, until these recent events, in the care and custody of both parents and had been in a residence in Tijuana. . . . [¶] And that it's clear that the home in Tijuana was in fact under considerable security guidelines, including but not limited to the presence, on and off, of body-guards and of some 16 in-place cameras about and within the perimeter of the home itself. [¶] And it would be clear to me, therefore, that events that

occurred between these parents would have been visible and known to the children based on . . . the physical layout of the home. The home is a rather open setting with a common landing that services bedrooms on the second floor, including the master bedroom in this matter. And a family TV room and gym area is also noted on that floor plan as noted . . . [in exhibit] 34. [¶] But the call of the question is whether or not there's been a habit, pattern, and history of violence perpetrated by [husband] towards [wife] that culminated in the events that in her testimony caused her to leave the residence on September 26 of '07 and the subsequent filing of papers and orders and requests for orders in the Mexican courts as a divorce began to thread its way through that court system. [¶] And in this particular matter, I look to not only the testimony given, but the demeanor of the parties while they testify and while they are seated in court hearing the testimony of percipient and key witnesses in this matter. I've also looked at the conduct of the parties throughout these proceedings, their conduct and their knowledge of what has been going on in the Mexican courts, and whether their conduct demonstrates evidence of being consistent or inconsistent with their claims. [¶] The claim here by the petitioner is that [husband] has been violent towards her, and she's testified to that under oath. It has been [husband's] testimony that these are fabrications; never took place; never done any of the things being suggested here by the [wife's] testimony. [¶] . . . [¶] I believe the . . . respondent in this case has engaged in oppressive, controlling, and physically violent behavior towards the petitioner."

The court also found husband began to "forum shop" in the Mexican courts to contravene the order of the Tijuana family court that awarded wife temporary custody of the children; husband was "aware" of the order giving wife temporary custody of the children when he "sequestered the children here in the United Stated for a period of time and allowed them to have no contact with their mother"; it took the "San Diego Police Department S.W.A.T team and the Child Abduction unit" to retrieve the children from husband and return them to wife; on the evening the children were reunited with wife, husband convened a "very powerful sounding collective of people in his sister's residence [in Tijuana] to caucus on his options"; and husband had the "financial wherewithal to pursue his legal interests in Mexico, where it appears that [wife] does not nearly have the same financial ability to protect her legal interests."

In addition, the court found wife to be "at risk" because she was a "very submissive woman, who finally took it upon herself not to submit to the violence any more." The court further found the two children were "too young to protect their own interests," and if the children were "not put under the protection of a permanent restraining order, . . . this court will lose the ability to protect not only [wife] but [the] children." Thus, the court concluded that although Mexico had jurisdiction over the divorce and marital

assets, the children, who were legally in the United States with their mother, were subject to protection in California.

The California court set a hearing for April 16, 2009, to consider visitation. The court requested the parties' counsel meet and confer before that hearing and suggested the parties consider using a "webcam system" supervised by a Spanish speaker for husband's visitation. The court noted husband wanted a relationship with his children, it did not want to interfere with that relationship as long as certain guidelines were met, but it had "strong concerns" regarding visitation because husband already had taken the children from wife without any authority.

### G. The California Court Refuses to Make Custody and Visitation Orders Beyond Those Specified in the Permanent Restraining Order

In connection with the April 16 hearing, husband filed voluminous papers in the California court, including a "request for judicial notice" of proceedings/orders from Mexico that took place and/or were issued after the December 10, 2008 hearing. In his request for judicial notice, which in effect was a motion to reconsider, husband again asked the California court to adhere to its earlier ruling (made by Judge Wohlfeil) that it lacked jurisdiction to protect the children in the restraining order and/or to enter custody and/or visitation orders, because the Tijuana family court had exclusive jurisdiction over these matters.

At the April 16 hearing, the California court, Judge Schall presiding, recognized that from the beginning husband claimed the California court lacked jurisdiction to protect the children under the domestic violence laws of California, and that because husband continued to contest jurisdiction, it declined to make any orders with respect to custody and visitation beyond those already made in the April 9, 2009 permanent restraining order. The California court noted it instead would address by way of noticed motion custody and visitation in connection with husband's request for registration of the orders by the Mexican courts.

In making this determination, Judge Schall noted she had gone back and reviewed Judge Wohlfeil's December 10, 2008 minute order. Judge Schall determined that order was "not on the merits" and that the California court retained the authority to address wife's application for a domestic violence restraining order, which included whether the children would be protected by the restraining order.

The California court also ruled the permanent restraining order did not prevent wife from participating in proceedings in Mexico, nor did the

restraining order "preclude the children from participating in or attending court proceedings or evaluations in Mexico ordered by the Tijuana Family Court, provided the Mexican Court makes certain that said participation will not violate the terms and conditions of the restraining order[]." The California court noted that although it could not "control the proceedings in Mexico," it hoped that "good officers of [the Mexican] Court would operate to make sure that each party's rights are protected and that [wife] is put in a position of believing she can arrive to proceedings in Mexico without risk to herself or the children."

The California court clarified wife was the primary caretaker of the children under the restraining order, but the restraining order did not reach the issue of sole legal and physical custody of the children. It set a followup hearing to address husband's request for registration of the Mexican orders and wife's request to consolidate all related matters into one case (e.g., the DVPA and Hague actions). The California court noted that with this additional information, it would be in a better position to address husband's request for visitation and balance "any existing Mexican visitation orders and custody orders against the facts and evidence received in this case." Finally, the California court appointed a reunification counselor to interview the children and the parties and prepare for the court a written report regarding visitation.

### H. Husband Moves to Vacate the April 9 and April 16, 2009 Orders

In late July 2009, husband filed a motion to vacate the April 9, 2009 permanent restraining order.[14] Husband claimed that order included findings that were contrary to those on the record, contained clerical errors, and was invalid because it was not served on husband before being entered.

While that motion was pending, husband moved to vacate the April 9 *and* April 16, 2009 orders on the separate ground that wife and her counsel had "perpetrated a fraud" on the California court by failing to disclose that wife in March 2008 filed for legal separation and sought a temporary restraining order against husband in an action commenced in San Diego Superior Court, South County (*Fernandez v. Campoy*, No. DS36436). Husband claimed he had just learned of that action and the decision of Judge H. Ronald Domnitz to decline jurisdiction because the Mexican family court had jurisdiction and Judge Domnitz did not want "litigation on both sides of the border."

---

[14] Husband also filed a petition for writ of mandate in this court in mid-June 2009 (case No. D055303) seeking a judicial determination that the Tijuana family court had exclusive jurisdiction over custody and visitation and requesting the California court to advance the hearing date on his motion for registration to enforce the Tijuana family court's November 25, 2008 visitation order. This court on July 2, 2009, denied that petition.

The California court, Judge Schall presiding, heard husband's motions to vacate on September 15, 2009.[15] As a result of that hearing, the court entered new orders nunc pro tunc, retroactive to April 9 and April 16, 2009.[16] In so doing, the California court refused to change the finding that the United States, and not Mexico, was the country of "habitual residence" of the children in connection with visitation and custody.

The California court noted that neither party had asked it to make a finding regarding the children's "habitual residence." Nonetheless, the California court found that up until husband took the children and brought them in June 2008 to the United States to live, their residence was Tijuana, Mexico. However, from June 2008 going forward, the California court determined the children resided in the United States with wife. Because the California court found wife's "clear intention" was to remain in the United States with the children and not return to Mexico, it ruled at the September 15, 2009 hearing that the United States was the children's habitual residence.

The California court also addressed the issue of visitation, after husband said he had not hugged his children in a year, he loved them and missed them. Husband mentioned his webcam visitations with his son were going well, but his daughter did not want to talk to him, which he could not understand because they had been close for many years.

In response, the California court indicated it wanted the children's counselor to address with the children whether they wanted to have in-person visits with their dad (which had, in any event, been ordered by Judge Magana in Nov. 2008) and recognized husband wanted such visits because it had been a long time since he had any physical contact with his children. On this issue, the court noted: "We're really down to the following: I made findings [husband was] abusive. I made findings [husband] took off with the kids. I didn't have to make those findings. That was uncontroverted. I made certain observations on the record [of] the fact that the children have been traumatized by this. [¶] But children who are traumatized are not indefinitely going to have no[] contact with their parents. [Husband] is not a convicted criminal, child molester, or someone I can't set up guidelines." Thus, the court made clear that the children's therapist should at all times be addressing in a therapeutic setting the children's desire to extend visitation beyond a webcam.

---

[15] The transcript of the hearing from September 15, as well as several other hearings between the parties (e.g., those on May 20, Aug. 13, Aug. 21 and Sept. 30, 2009), were not included in the record on appeal.

[16] The California court subsequently filed the domestic violence order on October 23, 2009, nunc pro tunc to April 9, 2009.

I. *The California Court Recognizes Judge Magana's Letter Rogatory but Determines More Information Is Needed to Determine Whether Husband Is Entitled to "Physical Visitation" as Ordered by the Tijuana Family Court*

On September 30, 2009, the California court, Judge Schall presiding, granted husband's request for registration of the February 13, 2009 letter rogatory remitted by Judge Magana. As relevant to this appeal, the California court made the following findings: "1. That the Mexican Court orders are not completely privy to those facts and information that this Court has when it grants an application for Domestic Violence Restraining Order, as it has done in this case.

"2. That [wife] was duly noticed and served in October 2008 for the hearing that was conducted by the Tijuana Family Court in November 2008, in which the order for hours of telephonic and personal visitation were granted on behalf of [husband].

"3. That through the reading of the Mexican Court's Letter Rogatory[,] this Court [in the DVPA action] makes the ultimate decision on the manner, means, and circumstances by which the visitation will occur.

"4. That many events have occurred in the lives of the children from the date the Mexican Court's Letters Rogatory were registered to this date, and currently this Court does not know as much as it needs to know to make a good judicial ruling on the issue of physical visitation.

"5. That a psychological evaluation of the children is needed for this Court to understand the level of resistance and the reason for the resistance from the daughter and the son to have personal conversations with [husband].

"6. That this Court will not order the psychological evaluation of the parents unless the children's evaluator believes it would be necessary.

"7. That this Court has granted primary legal and primary physical custody of the minor children to [wife], not sole legal and sole physical custody."

Based on such findings, as relevant here the court ordered: "2. [Husband's] request for registration of the Tijuana Family Court's Letters Rogatory is granted, however, this Court will make the ultimate determination on the manner, means, and circumstances by which visitation shall occur, based upon the best interest of the children. [¶] . . . [¶]

"4. No personal visitation between the children and [husband] will be ordered until the psychological evaluation of the children has been completed.

"5. The web-cam visitation will continue pending future hearing. [¶] . . . [¶]

"7. The parties' counsel shall meet and confer as to the appointment of a visitation monitor who meets all California guidelines and is in the Superior Court's approved list . . . .

"8. The visitation supervisor shall make the determination as to whether or not [wife] should be present during any supervised visitation sessions. [¶] . . . [¶]

"13. [Wife] is obligated to share information with [husband] regarding the health and welfare of the children. [Husband] shall address his requests for this information through [wife's] attorney. If [husband] is unable to resolve any disputes over legal custody issues, he shall file a noticed motion, unless it is an emergency. Copies of the children's medical records . . . are to be provided to [h]usband's attorney after [wife's attorney's] office has had an opportunity to review and redact from those records any information that would provide the whereabouts of [wife] and the children."

## DISCUSSION

Husband's primary contention on appeal is that the California court in the DVPA action, Judge Schall presiding, erred when it included the children in the permanent domestic violence restraining order filed on October 23, 2009, nunc pro tunc to April 9, 2009, and made various findings regarding visitation and custody in connection with that order. According to husband, because Judge Wohlfeil ruled the family court in Tijuana, Mexico, *already* had exercised jurisdiction over the children when wife filed her request for restraining order in late November 2008, and because Judge Wohlfeil's ruling dismissing the children from the restraining order was on the merits and wife did not appeal that order, Judge Schall lacked the power under the UCCJEA to modify or alter Judge Wohlfeil's earlier final order and to ignore the visitation order of the Mexico family court.[17]

---

[17] Wife contends on appeal husband waived various claims of error by failing, with the exception of sufficiency of the evidence, to raise them below in the trial court. The record shows, however, that husband made numerous objections to Judge Schall's decision to include the children within the scope of wife's restraining order, which by necessity involved custody and visitation, because Judge Wohlfeil previously declined to exercise emergency jurisdiction over the children. In any event, we need not decide whether there has been a forfeiture here. We instead exercise our discretion to decide questions of law presented for the first time on appeal. (See *California Pools, Inc. v. Pazargad* (1982) 131 Cal.App.3d 601, 604 [182 Cal.Rptr. 568]; *Redevelopment Agency v. City of Berkeley* (1978) 80 Cal.App.3d 158, 167 [143 Cal.Rptr. 633].)

After oral argument in this court, and at our request, the parties submitted supplemental briefing on various issues. Both parties agree in their supplemental briefing that the UCCJEA is the exclusive means of determining subject matter jurisdiction in custody disputes involving other jurisdictions, including foreign ones. However, wife argues the UCCJEA did not apply here because Judge Schall's exercise of jurisdiction over the children was not a "child custody determination" within the meaning of the UCCJEA. We turn first to that issue.

### A. *Whether the UCCJEA Applied in the DVPA Action*

Both parties admit that the UCCJEA is the "exclusive means of determining subject matter jurisdiction in custody disputes involving other jurisdictions. [Citations.]" (See *In re Karla C.* (2010) 186 Cal.App.4th 1236, 1268 [113 Cal.Rptr.3d 163]; *In re Angel L.* (2008) 159 Cal.App.4th 1127, 1136 [72 Cal.Rptr.3d 88]; *In re Marriage of Sareen* (2007) 153 Cal.App.4th 371, 376 [62 Cal.Rptr.3d 687].) The UCCJEA ensures that only one state has jurisdiction to make "child custody determinations," which, as relevant here, is defined in section 3402, subdivision (c), to include a "permanent, temporary, initial, and modification order" of a "court providing for the legal custody, physical custody, or visitation with respect to a child." (See also *In re Marriage of Nurie* (2009) 176 Cal.App.4th 478, 497 [98 Cal.Rptr.3d 200] ["[A]mong the primary purposes of the [UCCJEA and its predecessor, the Uniform Child Custody Jurisdiction Act (UCCJA)] is to encourage states to respect and enforce the prior custody determinations of other states, as well as to avoid competing jurisdiction and conflicting decisions."].)[18]

Wife, however, argues that a "protective order directing one parent to stay away from the children when they are in the lawful custody of the other parent, or to have no contact with the children except during authorized visits, is *not* an order 'providing for the legal custody, physical custody, or visitation with respect to a child,' " as provided in section 3402, subdivision (c). "Rather, it is an order restraining the parent's conduct during periods when [that parent] is *not entitled* to exercise legal rights to custody or visitation. Thus, Judge Schall had subject matter jurisdiction under the DVPA to entertain [wife's] request for non-custody protective orders pertaining to the children."

We note, however, that the UCCJEA specifically applies in domestic violence proceedings. (§ 3402, subd. (d) [the term "child custody proceeding"

---

[18] In 1997, the UCCJA (Uniform Child Custody Jurisdiction Act) was amended and renamed the UCCJEA. Cases interpreting the UCCJA are instructive in deciding cases under the UCCJEA except where there is a conflict between the two statutory schemes. (*In re A. C.* (2005) 130 Cal.App.4th 854, 860 [30 Cal.Rptr.3d 431]; see also *In re C. T.* (2002) 100 Cal.App.4th 101, 106 [121 Cal.Rptr.2d 897].)

for purposes of the UCCJEA "includes a proceeding for . . . protection from domestic violence"].) In addition, as husband points out in his supplemental brief, the drafters of the UCCJEA and its predecessor state in the "official commentary" that the UCCJEA was enacted "long before the advent of state procedures on the use of protective orders to alleviate [the] problems of domestic violence. Issues of custody and visitation often arise within the context of protective order proceedings since the protective order is often invoked to keep one parent away from the other parent and the children when there is a threat of violence. [The UCCJEA] recognizes that a protective order proceeding *will often be the procedural vehicle for invoking jurisdiction by authorizing a court to assume temporary emergency jurisdiction* when the child's parent or sibling has been subjected to or threatened with mistreatment or abuse." (9 pt. 1A West's U. Laws Ann. (1999) UCCJEA, com. to § 204, p. 678 ["Relationship to Protective Order Proceedings"], italics added.) We thus agree with husband that the UCCJEA serves as the basis upon which subject matter jurisdiction is predicated, while the DVPA or a similar statutory scheme serves as the "procedural vehicle" to invoke subject matter jurisdiction as otherwise authorized by the UCCJEA.

■ The language of the temporary emergency jurisdiction statute itself supports our conclusion. (See *Hicks v. E.T. Legg & Associates* (2001) 89 Cal.App.4th 496, 505 [108 Cal.Rptr.2d 10] [a " 'statute is not to be read in isolation, [but rather] it must be construed with related statutes and considered in the context of the statutory framework as a whole.' "].) Section 3424, subdivision (a), provides a court has temporary emergency jurisdiction over a child if the child is present in this state, and as relevant here, if "it is necessary in an emergency to protect the child because the child, or a sibling *or parent of the child*, is subjected to, or threatened with, mistreatment or abuse." (Italics added.) Thus, the language of subdivision (a) of section 3424 clearly shows the Legislature's intent that the UCCJEA apply to situations like the one at hand, where wife sought a restraining order against husband in the DVPA action.

In addition, subdivision (b) of section 3424 provides if there has been no *previous* child custody determination and a child custody proceeding *has not been commenced* in a state under sections 3421 to 3423, a "child custody determination made under this section remains in effect until an order is obtained from a court of a state having jurisdiction under Sections 3421 to 3423, inclusive." However, if there has been a *previous* child custody determination that is entitled to be enforced under the UCCJEA, or if a child custody proceeding *has been commenced* in a court in a state under sections 3421 to 3423, subdivision (c) of section 3424 states an order issued by a court of *this* state must follow the statutory requirements in subdivision (c).

■ Thus, it is clear from the plain language of subdivisions (b) and (c) of section 3424 that the "child custody determination" and "child custody

proceeding" each refers to involve those made or commenced in another state *before* the court in *this* state determines whether it has temporary emergency jurisdiction. As such, wife's argument that there was no child custody determination when Judge Schall included the children within the scope of the restraining order focuses on the wrong point in time, and plainly ignores the fact that there appears to have been such a determination made by, and such a proceeding *previously* initiated by wife in, the family court in Tijuana.

Finally, we note that under subdivision (d) of section 3424, the Legislature declared its intent to "afford all children found in California the protection of California's juvenile court[s] in exigent circumstances" (*In re Angel L., supra,* 159 Cal.App.4th at p. 1138), and to expand the grounds under which a court may exercise temporary emergency jurisdiction to include, among others, "*cases involving domestic violence*" (§ 3424, subd. (e) (italics added)).[19] Again, the statutory scheme makes clear the Legislature's intent that the UCCJEA applies in domestic violence proceedings. We thus reject wife's argument that Judge Schall's determination to include the children within the scope of the protective order in the DVPA action was not a "child custody determination" within the meaning of the UCCJEA.

### B. *The UCCJEA*

■ Section 3421 provides that except as authorized by section 3424 (the temporary emergency jurisdiction statute), California courts must recognize and enforce another forum's child custody determination, even if that forum has *not* adopted the UCCJEA, if the forum court exercised jurisdiction in substantial conformity with the UCCJEA or the determination was made under factual circumstances meeting UCCJEA jurisdictional standards. (§ 3443, subd. (a); see also *In re Marriage of Zierenberg* (1992) 11 Cal.App.4th 1436, 1442–1443 [16 Cal.Rptr.2d 238].)

Under the UCCJEA's definitional and jurisdictional provisions, a court of this state must "treat a foreign country as if it were a state of the United States . . . ." (§ 3405, subd. (a); see also *In re Marriage of Nurie, supra,* 176

---

[19] Former section 3403, subdivision (a), as it existed in 1999 and as relevant here, provided a California court had jurisdiction to make a child custody determination if "(2) It is in the best interest of the child that a court of this state assume jurisdiction because (A) the child and the child's parents . . . have a significant connection with this state, and (B) there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships[,] [or] [¶] (3) [t]he child is physically present in this state and (A) the child has been abandoned or (B) it is necessary in an emergency to protect the child because the child has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent. For the purposes of this subdivision, 'subjected to or threatened with mistreatment or abuse' *includes a child who has a parent who is a victim of domestic violence,* as defined in Section 6211." (Italics added.)

Cal.App.4th at p. 490.)[20] Thus, a "child custody determination made in a foreign country under factual circumstances in substantial conformity with the jurisdictional standards of [the UCCJEA] must be recognized and enforced . . . ." (§ 3405, subd. (b).)

Generally, the UCCJEA takes a strict " 'first in time' approach to jurisdiction." (*In re Marriage of Paillier* (2006) 144 Cal.App.4th 461, 469 [50 Cal.Rptr.3d 459].) With certain exceptions discussed *post*, "once the court of an appropriate state [citation] has made a 'child custody determination,' that court obtains 'exclusive, continuing jurisdiction . . . .' [Citation.]" (*Ibid.*; see also *Grahm v. Superior Court* (2005) 132 Cal.App.4th 1193, 1200 [34 Cal.Rptr.3d 270]; *In re Karla C., supra*, 186 Cal.App.4th at p. 1268.) As such, the court of another state, including California, "[c]annot modify the child custody determination (Fam. Code, §§ 3421, subd. (b), 3422, subd. (a), 3423, 3446, subd. (b))" and "[m]ust enforce the child custody determination (Fam. Code, §§ 3443, 3445, 3446, 3448, 3453)." (*In re Marriage of Paillier, supra*, 144 Cal.App.4th at p. 469.)

" '[S]ubject matter jurisdiction [under the UCCJEA] either exists or does not exist at the time the action is commenced' " (*In re A. C., supra*, 130 Cal.App.4th at p. 860; see also *Guardianship of Ariana K.* (2004) 120 Cal.App.4th 690, 701 [15 Cal.Rptr.3d 817]), which is when the first pleading is filed. (§ 3402, subd. (e).) "There is no provision in the UCCJEA for jurisdiction by reason of the presence of the parties or by stipulation, consent, waiver, or estoppel." (*In re Marriage of Nurie, supra*, 176 Cal.App.4th at p. 491; see § 3421, subd. (c) ["Physical presence of, or personal jurisdiction over, a party or a child is not necessary or sufficient to make a child custody determination."].)

Finally, the "best interests of the child" is *not* relevant to the issue of whether a court has the *authority* under the UCCJEA to exercise jurisdiction. (*In re Marriage of Nurie, supra*, 176 Cal.App.4th at p. 492 [the term "best interests" of the child has been eliminated from the UCCJEA " 'to clearly distinguish between the jurisdictional standards and substantive standards relating to child custody and visitation.' [Citations.]")

## C. *Temporary Emergency Jurisdiction*

██ However, even when UCCJEA jurisdiction rests with another state or country, as noted *ante* a California court may exercise temporary jurisdiction

---

[20] The only exception is that a "court of this state need not apply [the UCCJEA] if the child custody law of [the] foreign country violates fundamental principles of human rights." (§ 3405, subd. (c).) Nothing in the record here suggests the custody laws of Mexico in any way violate principles of human rights, nor do the parties argue as much.

if the child is present in this state and, as relevant here, the exercise of such jurisdiction is "necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to, or threatened with, mistreatment or abuse." (§ 3424, subd. (a).)

The authority to exercise temporary emergency jurisdiction is not unlimited, however. Subdivision (c) of section 3424 provides: "If there is a previous child custody determination that is entitled to be enforced under this part . . . any order issued by a court of this state under this section must specify in the order a period that the court considers adequate to allow the person seeking an order to obtain an order from the state having jurisdiction . . . . The order issued in this state remains in effect until an order is obtained from the other state within the period specified or the period expires."

■ Thus, when there is a previous order entitled to be enforced under the UCCJEA, the California court's order exercising emergency jurisdiction " 'must specify [in that order] "a period that the court considers adequate to allow the person seeking an order to obtain an order from the state [or foreign country] having jurisdiction." [Citation.] It "remains in effect until an order is obtained from the other state [or country] within the period specified or the period expires." [Citation.]' " (*In re A. C., supra,* 130 Cal.App.4th at p. 863.) However, "[e]ven though emergency jurisdiction ordinarily is intended to be short term and limited, [a court] may continue to exercise its authority as long as the risk of harm creating the emergency is ongoing." (*In re Angel L., supra,* 159 Cal.App.4th at p. 1139.)

Subdivision (d) of section 3424 further requires a California court, informed that another court from a different forum has made a prior custody and/or visitation determination in substantial conformity with the UCCJEA or is then entertaining such a proceeding, to communicate *immediately* with that other court. "Immediately" means "as soon as possible after learning of the existence of proceedings in the sister state court. The courts must 'resolve the emergency, protect the safety of the parties and the child, and determine a period for the duration of the temporary order.' (§ 3424, subd. (d).) To make an appropriate order under the [UCCJEA], the California court needs to know whether the sister state court wishes to continue its jurisdiction and how much time it requires to take appropriate steps to consider further child custody orders. [Section 3424, subdivision (d)] does not allow the California court to wait to contact the other court until it makes a determination under the [UCCJEA] to assume emergency jurisdiction." (*In re C. T., supra,* 100 Cal.App.4th at pp. 110–111, fns. omitted [concluding the California juvenile court erred when it waited almost a month to contact the Arkansas court after learning of the latter's custody order].)

"The finding of an emergency 'should not be made "in a rush to judgment" but rather "after a full and fair evidentiary hearing." [Citation.]' (*People v. Beach* (1987) 194 Cal.App.3d 955, 963 [240 Cal.Rptr. 50]; see also *Matter of C.O. and J.O.* (1993) 1993 Okla.Civ.App. 64 [856 P.2d 290, 294] [the 'court has the duty to take evidence on the issue of abuse to determine whether emergency jurisdiction is proper'].)" (*In re C. T., supra,* 100 Cal.App.4th at p. 107.) Thus, mere allegations "are insufficient to invoke emergency jurisdiction." (*Ibid.*)[21]

When reviewing a jurisdictional order under the UCCJEA, a court of review is not bound by the trial court's findings and may independently reweigh the jurisdictional facts. (*In re Marriage of Nurie, supra,* 176 Cal.App.4th at p. 492; *In re Marriage of Sareen, supra,* 153 Cal.App.4th at p. 376.)

### D. *Analysis*

The record here shows the California court, Judge Wohlfeil presiding, on December 1, 2008, exercised temporary emergency jurisdiction over the children when it reissued the restraining order and included the children within the scope of that order's protection. However, the court noted it was "extremely uncomfortable" continuing jurisdiction after December 10, 2008, because the family court in Mexico already had made various orders regarding the children, including custody and visitation. As a result, at the December 10 hearing it granted husband's motion to quash and to dismiss the children from the case for lack of jurisdiction and set the matter for hearing on wife's request for a permanent restraining order.

The record also shows that in the two hearings in April 2009, Judge Schall presiding, the California court did not appear to rely on the UCCJEA in determining whether it could exercise jurisdiction over the children, including on a temporary emergency basis, despite the fact the UCCJEA is the *exclusive* means to determine jurisdiction over a child in a "child custody proceeding." (*In re Karla C., supra,* 186 Cal.App.4th at p. 1268; *In re Angel L., supra,* 159 Cal.App.4th at p. 1136.) Instead, Judge Schall found she was entitled to include the children in the domestic violence protection order and make custody and visitation determinations in connection with that order because Judge Wohlfeil in December 2008 had merely denied wife's "ex parte application" for a restraining order.

---

[21] The "fact the court must hold an evidentiary hearing does not deprive it, prehearing, of jurisdiction to detain the child. '[W]hen a petition contains allegations of an emergency situation, it is proper for a court to issue an interim custody order to protect the child pending a hearing.' [Citations.]" (*In re C. T., supra,* 100 Cal.App.4th at p. 108, fn. 3.)

██ We note, however, there is no "ex parte" exception to the UCCJEA, and in any event, this "finding" is not supported by the record, which instead shows Judge Wohlfeil declined to exercise emergency jurisdiction over the children because the Tijuana family court already had such jurisdiction, which, with certain exceptions, is exclusive under the UCCJEA. (See § 3405, subd. (b) [a "child custody determination made in a foreign country under factual circumstances in substantial conformity with the jurisdictional standards of [the UCCJEA] must be recognized and enforced . . ."]; see also *In re Marriage of Zierenberg, supra,* 11 Cal.App.4th at pp. 1442–1443 [Puerto Rico custody order entitled to enforcement in California]; *In re Marriage of Malak* (1986) 182 Cal.App.3d 1018, 1026–1029 [227 Cal.Rptr. 841] [Lebanese custody order enforced in California]; but see *In re Marriage of Sareen, supra,* 153 Cal.App.4th at p. 377 [California not required to enforce prior custody order from India, where jurisdiction was not in substantial conformity with UCCJEA standards because husband filed his petition for custody only nine days after the family arrived in India].)

However, we are not persuaded that Judge Schall was precluded under the facts presented from revisiting the issue of emergency jurisdiction in April 2009, after the California court found that husband engaged in domestic violence against wife that was witnessed by the children and found that husband took the children from wife without an order from *any* court and prevented wife from seeing them for more than three months.[22]

██ Here, wife's request for a domestic violence restraining order was still to be decided and thus required further judicial action when the matter was pending before Judge Wohlfeil. As such, we conclude that Judge Wohlfeil's order declining to exercise temporary emergency jurisdiction over the children was provisional in nature, and that a California court could revisit that issue if and when a restraining order issued.[23] (See *Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1096 [29 Cal.Rptr.3d 249, 112 P.3d 636] [a court possesses the inherent authority to reconsider its own interim orders

---

[22] We note that Judge Wohlfeil relied solely on temporary emergency jurisdiction as provided in section 3424, subdivision (a), in exercising jurisdiction over the children. Thus, Judge Wohlfeil did not rely on, or make any findings regarding the application of, the other bases of jurisdiction set forth in section 3421, subdivision (a). As such, on remand the California court *may* consider whether any of the four jurisdictional bases set forth in section 3421, subdivision (a), apply to the children. Our holding in this case that a California court may revisit the jurisdictional issue after a finding of domestic violence applies *only* to temporary emergency jurisdiction under section 3424, subdivision (a), and not to jurisdiction under section 3421, subdivision (a), which sets forth the jurisdictional tests for an *initial* custody determination.

[23] Because Judge Wohlfeil's December 10, 2008 order was interlocutory, we conclude the doctrine of res judicata did not apply to it. (See *Morris v. McCauley's Quality Transmission Service* (1976) 60 Cal.App.3d 964, 973 [132 Cal.Rptr. 37] ["The doctrine of res judicata applies only to final judgments, that is, to judgments which are free from attack on appeal."];

prior to entry of final judgment, even in the absence of new law or new facts]; *Art Movers, Inc. v. Ni West, Inc.* (1992) 3 Cal.App.4th 640, 650 [4 Cal.Rptr.2d 689] [concluding an appeal from the denial of a permanent injunction was not reviewable because review could "only be intelligently accomplished when the merits of the litigation ha[d] been determined"]; *Bishop Creek Lodge v. Scira* (2000) 82 Cal.App.4th 631, 633 [98 Cal.Rptr.2d 398] [ruling an interlocutory order denying a permanent injunction was not immediately appealable because further proceedings were necessary (e.g., to determine whether the plaintiff was entitled to damages as opposed to equitable relief)]; *Lyon v. Goss* (1942) 19 Cal.2d 659, 670 [123 P.2d 11] [as a general rule, where something "further in the nature of judicial action on the part of the court is essential to a final determination of the rights of the parties, the decree is interlocutory"].)

Indeed, at the time Judge Wohlfeil declined to exercise emergency jurisdiction over the children, they were living with wife in the United States in a domestic violence shelter and she had primary custody over them. As such, any order restraining husband under the DVPA necessarily would involve the children, and at a minimum would require the California court to make certain, even if limited, determinations regarding custody and visitation in connection with that order.

We ·decline the invitation of husband to adopt a rule that prevents *as a matter of law* a California court from exercising temporary emergency jurisdiction over a child merely because that court previously refused to exercise such jurisdiction before it made a finding of domestic violence. Such a rule would undermine a California court's ability to protect a child present in California from immediate harm, in contravention of the intent of the Legislature, which we infer from the statutory scheme, to "afford all children found in California the protection of California's juvenile court[s] in exigent circumstances." (*In re Angel L., supra*, 159 Cal.App.4th at p. 1138; see also § 3424, subd. (e).)

■ We thus conclude that Judge Schall in April 2009 did not lack authority to revisit the December 10, 2008 interlocutory order of Judge Wohlfeil declining to exercise emergency jurisdiction over the children, in light of the findings of the California court that husband committed domestic violence against wife that the children witnessed, and that husband took the children who were under wife's custody and prevented wife from seeing them for more than three months. (See *Lacey v. Bertone* (1952) 109 Cal.App.2d 107, 110 [240 P.2d 395] ["It is obvious that where an issue is referred to a second

*City of San Diego v. Alpha Securities Corp.* (1950) 99 Cal.App.2d 246, 249 [221 P.2d 770] [a judgment that is interlocutory as to substance and effect is not "final" and not subject to res judicata principles].)

judge by an interlocutory judgment and all the evidence on that issue is heard by that [second] judge there is no reason why [that judge] may not make new findings on that issue, regardless of the findings of the first judge."].)

However, because the record shows Judge Schall ostensibly did not base her decision to exercise jurisdiction over the children on section 3424, subdivision (a), and, in any event, made no findings in that regard, and because, as a result, Judge Schall did not follow the statutory requirements of section 3424, including specifying in her order a "period that the court considers adequate to allow the person seeking an order to obtain an order from the state [or foreign country] having jurisdiction" (§ 3424, subd. (c)) and communicating *immediately* with the family court in Mexico (see § 3424, subd. (d)), we conclude the prudent course here is to reverse the April 9, 2009 permanent restraining order as it pertains to the children, custody, and visitation,[24] and to remand the matter to the California court.

On remand, the California court is instructed to follow the UCCJEA in determining whether in April 2009 emergency jurisdiction existed when it included the children in wife's permanent restraining order, to make appropriate findings based on this statutory scheme and *if* jurisdiction[25] exists under section 3424, subdivision (a), to adhere to the statutory requirements of that statute, including specifying in the order a period it considers adequate for the parties to obtain an order from the family court in Mexico (§ 3424, subd. (c)); and in communicating immediately with the family court in Mexico to "resolve the emergency, protect the safety of the parties and the child, and determine a period for the duration of the temporary order." (§ 3424, subd. (d).)

In light of our decision to reverse and remand with instructions, we conclude it is unnecessary to resolve husband's contention that the California court's April 9, 2009 restraining order had the effect of denying him "all contact with his children" in violation of his fundamental rights under the Fourteenth Amendment and his contention that there was insufficient evidence in the record to support a protective order for the children.[26]

---

[24] In so doing, we also reverse the finding of the California court that the United States, and not Mexico, was the country of "habitual residence" of the children in connection with visitation and custody.

[25] See footnote 2, *ante.*

[26] In light of our decision, we conclude wife's request is premature for attorney fees under section 6344. We also deny wife's opposed request for a *partial* dismissal of appeal, and find wife's request to submit additional briefing moot on the issue of identifying the ways, if any, Judge Schall did not follow the UCCJEA and specifically, section 3424, in connection with our request for supplemental briefing.

## DISPOSITION

The domestic violence restraining order filed by the California court on October 23, 2009, nunc pro tunc to April 9, 2009, is reversed as it pertains to the children, custody, and visitation. The case is remanded to the California court with instructions that it adhere to the UCCJEA in determining whether emergency jurisdiction existed in April 2009 when it included the children in wife's permanent restraining order, and *if* jurisdiction exists under section 3424, subdivision (a), to make appropriate findings based on this statutory scheme and adhere to its statutory requirements. The parties to bear their own costs of appeal.

Haller, J., and McIntyre, J., concurred.

A petition for a rehearing was denied February 3, 2011.